# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CARLA DeANGELIS,
    *Plaintiff*,

    v.

CITY OF BRIDGEPORT, *et al.*,
    *Defendants*.

No. 3:14-cv-01618 (JAM)

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Carla DeAngelis worked for the City of Bridgeport as a "telecommunicator" to answer emergency phone calls. She has filed this lawsuit against the City and three of her supervisors at the emergency call center alleging claims for discrimination and retaliation relating to her gender and sexual orientation. She also alleges a wide range of other federal and state law claims based on essentially the same facts. Defendants have now moved for summary judgment. For the reasons stated below, I will grant defendants' motion as to most of plaintiff's claims, but deny it with respect to her claims of gender discrimination, retaliation, and both intentional and negligent infliction of emotional distress.

### BACKGROUND

The following facts are either not disputed or, where disputed, are presented in the light most favorable to plaintiff as the non-moving party. Between February 2012 and December 2013, Plaintiff worked for defendant City of Bridgeport as a telecommunicator at the City's Public Safety and Communications Center (the "Center"). Plaintiff has filed this lawsuit against the City as well as against individual defendants including Dorie Price, who was director of the Center, Anthony P. D'Onofrio, Jr., who was plaintiff's supervisor, and Debra Deida, who was a training officer at the Center.

As part of her work, plaintiff was required to answer emergency calls and help respond to them, such as by asking the caller for information and assisting in the dispatch of the City's emergency services. Plaintiff was an employee whose peers and supervisors characterized her as knowledgeable, positive, and easy to work with. *See, e.g.*, Doc. #49-7 at 6.

While all parties acknowledge that an emergency call center can be a stressful work environment, plaintiff has adduced evidence going beyond usual workplace stress. Plaintiff and her coworkers attested that D'Onofrio was extremely aggressive toward women subordinates in the office, routinely yelling at them and getting into arguments with them, and then following them around in the office or even outside to continue arguing. Doc. #49-4 at 40–42; Doc. #49-5 at 64–66; Doc. #49-6 at 21. And while D'Onofrio would be confrontational verbally with male employees, he would not physically pursue them through the halls or outside as he did with women. Doc. #49-5 at 64–66.

Women were also treated differently by the supervisors when it came to disciplinary rules like dealing with mistakes made on calls or the enforcement of rules surrounding break times. A woman making an error on a call would be yelled at by a supervisor repeatedly, while a man would be relieved and allowed to take a break. Doc. #49-5 at 60–62. Men would also be put on less strenuous overtime shifts. *Id.* at 62. And men would be treated more leniently when it came to break time; they would be allowed to leave frequently and be gone for long stretches, while women would be asked who gave them permission for the break and the exact times they began and ended the breaks. *Id.* at 68–69.

D'Onofrio, who maintained a sign-out system for breaks in which employees signed up for break time in advance on two separate sheets, used the system "to single women out," behaving volatilely toward women and not letting them go to the bathroom, but not bothering

men regarding the sign-out requirement. Doc. #49-4 at 52. D'Onofrio was not the only defendant whom female employees perceived as harassing them with disciplinary write-ups; one coworker claimed that she had experienced being harassed by Price to the point where she didn't want to come to work. Doc. #49-5 at 97.

In addition to this evidence about the working environment in general, plaintiff points to specific incidents that occurred between March and November 2013. In March of 2013, plaintiff was on duty and received a call regarding a head trauma. Doc. #49-4 at 16. D'Onofrio was supervising at that time, but was not wearing his headset that allowed him to listen to the calls as they were coming in. *Id.* at 18. D'Onofrio believed plaintiff was mismanaging the call, and he walked over to her and began interrupting her and asking her why she was directing the call the way she was. Plaintiff told him she could not talk to him at that moment and continued handling the call. *Id.* at 20. D'Onofrio yelled at plaintiff, but she ignored him to focus on the call. *Id.* at 24.

Two weeks after the call, D'Onofrio ordered plaintiff into the supervisor's office. Doc. #49-4 at 25. Apparently in reference to plaintiff's tone when she responded to him during the call, D'Onofrio said "the only time you should answer me like that is when I am grabbing you by the neck and shaking you." *Ibid.* Plaintiff was shaken by the comment, and she felt physically threatened by D'Onofrio. *Ibid.*[1]

---

[1] Plaintiff's affidavit also asserts that at this time, D'Onofrio grabbed plaintiff's shoulders and started shaking her. Doc. #49-3 at 12. It also states that this encounter took place on March 31. *Id.* at 11. Plaintiff's deposition states that this meeting took place on April 14, and plaintiff does not mention physical contact. Doc. #49-4 at 25. While I am required to consider the evidence in the light most favorable to plaintiff, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). This includes evidence in an affidavit that "by omission or addition, contradicts the affiant's previous deposition testimony." *Ibid.* It is implausible that plaintiff would not have described this physical assault in her deposition for a lawsuit she initiated against D'Onofrio, particularly when she discussed the event during which it supposedly took place in detail. I therefore conclude that this allegation of physical contact is inconsistent with plaintiff's deposition, and I do not credit it for purposes of determining whether there is a genuine issue of material fact.

Later in April, plaintiff came to believe that another employee, Tammy Cowette, had made a mistake in how she had arranged the schedule, and asked Cowette to show plaintiff how she had come up with the arrangement. Doc. #49-3 at 13. Cowette declined, and plaintiff said, under her breath, "this is fucking ridiculous." *Ibid.*; Doc. #49-4 at 67. Cursing was frequent in plaintiff's workplace. Doc. #27-5 at 177. D'Onofrio approached the two of them, and told plaintiff "if you think you have any right to look at this schedule, you're ignorant." Doc. #49-4 at 39. D'Onofrio's manner was aggressive, and he was speaking loud enough for everyone else in the call center to hear; Cowette told him to calm down. *Ibid.*

The next day, plaintiff went to the cafeteria on a lunch break after she had signed out on one of the break sheets. Doc. #49-4 at 42–43. D'Onofrio, who monitored plaintiff's comings and goings, followed her into the cafeteria and got so close to plaintiff that she thought he was going to hit her. He yelled at plaintiff, and ordered her to go out and sign out on a second break sheet. *Ibid.*; Doc. #49-3 at 15. Plaintiff left the cafeteria and signed the sheet. #49-4 at 43. She then submitted a grievance about the incident that also discussed the incidents described in the previous two paragraphs. Doc. #27-5 at 26–27. The grievance described D'Onofrio as engaging in "intimidation" and "professional bullying," and described his behavior as "personally alarming" and "threatening." *Ibid.* Plaintiff was in a great deal of stress due to D'Onofrio's treatment, and she left work for several days due to abdominal pains. Doc. #49-3 at 15.

On the morning of July 26, plaintiff was informed by her union steward that she was supposed to be at a 10:00 A.M. hearing that same day; plaintiff had not been scheduled to work until 4:00 P.M., and she had not previously been informed about the hearing. Doc. #49-4 at 70–71. Defendant Price was present at the hearing; D'Onofrio and Cowette were not. The hearing was a disciplinary hearing regarding plaintiff's cursing during her interaction with Cowette

regarding the work schedule. Doc. #49-3 at 16; Doc. #27-5 at 75. Plaintiff admitted that she had

cursed, but said it was not directed at Cowette. Doc. #27-5 at 85. Plaintiff also raised

D'Onofrio's aggressive behavior during the hearing twice, but she was rebuffed. *Id.* at 95, 99.

Plaintiff was given a five-day suspension. Doc. #49-4 at 75. Price hand-delivered the suspension

letter to plaintiff while she was at work, in view of her coworkers. *Id.* at 80. Afterward, Price

laughed at plaintiff and stayed near plaintiff for several hours, leering at and monitoring her. *Id.*

at 91.

On July 31, plaintiff was notified that she was being investigated for a claim made

against her by Price. *Id.* at 86–87. Price had falsely claimed that after delivering the suspension

letter to plaintiff, plaintiff had tried to intimidate her. Doc. #27-5 at 73; Doc. #49-4 at 89. The

investigation did not result in discipline against plaintiff. Doc. #49-4 at 90. Yet plaintiff felt

threatened by Price's false complaint, and so several days later, in early August, plaintiff met

with an investigator with the Connecticut Commission on Human Rights and Opportunities

(CHRO) to report the treatment she had been subjected to at work. *Ibid.*

On September 16, D'Onofrio once again came into the break room and screamed at

plaintiff for not properly signing out. Doc. #49-4 at 49-50. D'Onofrio had been calling plaintiff

names and following her around for months, and his aggressive approach in the break room

made plaintiff "physically afraid." *Id.* at 55. Plaintiff told D'Onofrio that she had already signed

out, and when he continued to scream at plaintiff, she told him to "back the fuck off." *Ibid.*

D'Onofrio then told plaintiff "[h]ave it your way. We're going to do this the hard way." *Id.* at 58.

Plaintiff told D'Onofrio that she had "a stack of documents at city hall regarding your behavior

and harassment of me . . . Leave me alone or I'm going to go over your head and I'm going to

pursue getting you fired for harassing and chasing me." *Id.* at 56.

Later that day, plaintiff submitted an additional grievance to her union regarding D'Onofrio's behavior. *Id.* at 57; Doc. #27-5 at 209. In her grievance, she said that the day's events were identical to complaints that she had formally discussed with the CHRO, and that she had scheduled a hearing with the CHRO "to pursue these matters and protect [herself] . . . from intimidation, harassment and discrimination." Doc. #27-5 at 209. She did not mention her gender or sexual orientation in the grievance. *Id.* at 209–10.

A few days later, plaintiff met with defendant Deida. Plaintiff asked Deida to help get D'Onofrio to leave plaintiff alone so she could feel safe and do her job. Doc. #49-4 at 59–60. Deida asked plaintiff for information about D'Onofrio regarding his behavior, his job performance, and the names of others whom he had harassed. *Id.* at 64–65. Plaintiff answered many of her questions but did not disclose the names of others. *Ibid.* Shortly thereafter, Deida wrote up a disciplinary warning to plaintiff regarding absences over the prior year. Doc. #49-9 at 94. Deida later asked again for similar information, but plaintiff had been advised by her union representatives not to pass along any written complaints to Deida, and so plaintiff refrained from doing so. Doc. #49-3 at 19. On October 8, Deida delivered a memorandum to plaintiff stating that because plaintiff had not given her the requested documentation she was closing the case. Doc. #27-5 at 124.

On November 15, D'Onofrio and Deida called plaintiff in to the supervisor's office. Believing she was going to be disciplined, plaintiff went to get her union representative, Rita Marcus. Doc. #49-3 at 20. D'Onofrio wanted to discuss an incident that he claimed happened on November 9; D'Onofrio had written up an incident description alleging that upon hearing D'Onofrio and another employee discuss scheduling, plaintiff stated "[t]his place is fucking ridiculous," similar to the statement in April that she had been disciplined for. Doc. #27-5 at 126.

Plaintiff maintains that the November 9 incident never happened. Doc. #49-4 at 93–94. At the November 15 meeting, plaintiff asked D'Onofrio for corroborating details, such as the time, who any witnesses were, and why he had not talked to her when it had occurred. D'Onofrio could supply no further details. *Id.* at 95.

Plaintiff became upset and she asked Deida "[w]hen are we going to put an end to this?" *Id.* at 100. Plaintiff referred to the accusation against her as a "witch hunt," and declared "I've had enough of this." *Id.* at 101. She then said to D'Onofrio, "I'm going to get you. I'm going to get you fired." *Ibid.* After the meeting, plaintiff returned to her work station and continued to work for several hours; she was instructed to work an additional four hours that evening, and to come in the following day early to work extra hours before her regular shift. Doc. #49-3 at 20. D'Onofrio was also scheduled to work the next day's shift. *Ibid.*

After going home that day, D'Onofrio went to the Bridgeport Police Department and told the police that he felt threatened by plaintiff. Doc. #27-4 at 183. He told an officer there that he was afraid to go back to work because he was afraid plaintiff would hurt him. Doc. #49-6 at 64. D'Onofrio said that he had communicated his fears to Price, and she had told him to make a police report. *Ibid.* The police later spoke with Deida and Price, who both also told them that plaintiff made them fear for their safety at work. *Id.* at 78.

Two Bridgeport police officers went to the call center to speak with plaintiff. *Id.* at 65–66. An officer and Price came to plaintiff on the call center floor, Doc. #49-4 at 114, and plaintiff proceeded to go into a conference room, accompanied by her union representative, to discuss the incident with one of the officers. *Ibid.* One of the officers told plaintiff that Price had insisted on having her arrested, but that they were not going to do that. *Id.* at 116. The police issued a summons to plaintiff for disorderly conduct. Doc. #49-6 at 84. One of the officers said he "had

to" issue the summons because Price "wouldn't let down . . . wouldn't back down" on her insistence that plaintiff should be arrested. Doc. #49-4 at 116–17. Plaintiff was put on paid administrative leave and required to hand over her badge and locker key. Doc. #27-6 at 118.

Ten days later, plaintiff met with labor relations officer Phil White for an investigative interview. Doc. #49-9 at 38. Plaintiff and White discussed the events of November 15, and plaintiff recounted her version of events as well as prior incidents of harassment by D'Onofrio. *Id.* at 40–57. White referred to plaintiff's description of past incidents as "wild allegations." *Id.* at 67. Plaintiff also reported what she said was a "commonplace joke on the job, that . . . D'Onofrio may come in armed some day and shoot the building up like the Navy Yard in Washington." Doc. #49-9 at 62–63. White noted that this was a "very serious allegation," and he asked plaintiff to provide names of others who had said that. Plaintiff declined. *Id.* at 63.

White also interviewed Marcus, plaintiff's union representative, who referred to the police visit as "intimidat[ion]" of plaintiff. Doc. #27-5 at 169. Marcus also stated that cursing happened frequently in the office—with "every other word" being a curse word at times—and opined that it was "harassment" to go after plaintiff. *Id.* at 177. Marcus corroborated that plaintiff threatened D'Onofrio with legal action, not with bodily harm. *Id.* at 170–71.

On December 16, White held another hearing with plaintiff and informed her that she was being charged with insubordination for her failure to provide the names of others who had repeated the "commonplace joke" regarding D'Onofrio's potential for violence. Doc. #49-9 at 25. At the hearing, plaintiff gave two names, and she said that she had been hesitant to give names at the prior hearing because she did not want to speak on behalf of others. *Id.* at 26–27.

On December 19, Price called plaintiff and told her to return to work; she also sent her a letter to the same effect. Doc. #27-6 at 20. In response, plaintiff called Deida and said that she

would not return to work unless four conditions were met: (1) that all charges be dropped against her, (2) that the matter was expunged from her personnel record, (3) that her legal expenses for her criminal defense attorney were reimbursed, and (4) that her safety was guaranteed. *Id.* at 22. White then sent plaintiff a letter advising her "to report back immediately," acknowledging her stated conditions but urging her "to reconsider [her] action." *Id.* at 25. The letter stated that failure to return to work would be a violation of her contract and result in "appropriate action, up to and including termination of employment." *Ibid.* Plaintiff did not return to work, and White sent her another letter on December 26 stating that her unauthorized absence had been considered a resignation from employment.

Plaintiff filed a union grievance against the City, Doc. #27-6 at 139, and she notified defendants of her intent to commence a legal action against them. Doc. #49-9 at 100. After the CHRO and federal Equal Employment Opportunity Commission (EEOC) released her claims from their jurisdiction, she began this action in federal court. Doc. #1. Defendants now move for summary judgment on all of plaintiff's claims.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-

moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Bearing these standards in mind, I will now discuss defendants' motion with respect to each of the counts in plaintiff's complaint.

### *Gender Discrimination*

Counts One and Three of the complaint allege that the City of Bridgeport discriminated against plaintiff on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and in violation of the Connecticut Fair Employment Practices Act (CFEPA). In particular, plaintiff alleges that defendants violated these statutes by creating a hostile work environment.[2]

The Supreme Court has held that Title VII is violated by a "discriminatorily hostile or abusive [work] environment"—that is, a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). The test is the same under CFEPA. *See Martin v. Town of Westport*, 558 F. Supp. 2d 228, 242–43 (D. Conn. 2008).

---

[2] While plaintiff's complaint alleges discrimination based on sexual orientation, she appears to abandon this claim in her brief in opposition to summary judgment. Doc. #49 at 39; *Kovaco v. Rockbestos-Surprenant Cable Corporation*, 834 F.3d 128, 143 (2d Cir. 2016) ("a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). Defendants' motion is therefore granted with respect to plaintiff's claims in counts One through Four with respect to plaintiff's sexual orientation.

To prevail on a gender-based hostile working environment claim, a plaintiff must make a showing "that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir. 2007). Relevant factors include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Harris*, 510 U.S. at 23). As with all gender discrimination claims under Title VII, "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998).

Plaintiff has certainly adduced evidence of a hostile working environment—she has described her workplace as one in which supervisors screamed at and physically intimidated employees, regularly violated protocols while meticulously enforcing them against their subordinates, and threatened employees or accused them of insubordination if they questioned a supervisor's actions. *See, e.g.*, Doc. #49-4 at 41, 54–55; Doc. #49-5 at 50–60, 98–101. The sum total of this behavior paints a picture that a reasonable jury could find to be an environment that a reasonable person would find hostile or abusive. The fact that plaintiff filed grievances and complained about these acts is also additional evidence for a reasonable factfinder to conclude that plaintiff subjectively perceived the environment as hostile or abusive, as is plaintiff's deposition testimony itself.

Defendants argue that plaintiff has not submitted evidence that she subjectively believed she was subject to the hostile work environment because of her gender. This argument appears to conflate two elements of a hostile work environment claim: that there be "an environment that the plaintiff subjectively perceives as hostile or abusive," and that such an environment exist "because of the plaintiff's sex." *Patane*, 508 F.3d at 113. The subjective perception requirement does not itself contain a requirement that a plaintiff perceive the hostility at work to be because of her gender. Instead, the subjective perception requirement arises as part of the need to show that the complained-of conduct "actually altered the conditions of the victim's employment." *Harris*, 510 U.S. at 21–22. In other words, the requirement concerns whether the plaintiff suffered a statutorily cognizable injury to begin with, not whether the cause of that injury was discrimination. To import causation into Title VII's subjective perception element would be to double-count the causation requirement and unnecessarily burden plaintiffs in Title VII actions.

Plaintiff's evidence is thinner as to whether the hostile environment was created because of her gender. Plaintiff has not submitted any comments by defendants or other supervisors indicating a gender-based discriminatory intent. And none of the actions plaintiff describes are as overtly gender-based as many of the incidents that frequently form the basis for hostile work environment claims. *See, e.g.*, *Alfano v. Costello*, 294 F.3d 365, 379–80 (2d Cir. 2002) (listing incidents from many cases, including touching of and commenting about body parts, sexual jokes, and discussion of sexual experiences outside of work).

But plaintiff has submitted evidence that the hostile actions she describes were done either primarily to or only to women. She has submitted her own testimony, as well as the testimony of three other female employees, describing several recurring acts that could plausibly cause a jury to infer that the hostile environment plaintiff experienced was due to sexism:

D'Onofrio insulted women, mocked them, screamed at them, and made them feel physically threatened, but never did so to men, Doc. #49-4 at 40–55; D'Onofrio would argue with both men and women but would not stand down in arguments with women, following them around the building and outside on their breaks and continuing to argue with them, Doc. #49-5 at 65–66; women would be screamed at if they did something wrong on a call, whereas men would be given the opportunity to take a break, *id.* at 61; men would be allowed to take breaks more often, and not questioned as rigorously as women about whether they had permission for their breaks, *id.* at 69, Doc. #49-4 at 52.[3]

Bearing in mind my obligation to view the evidence in the light most favorable to the plaintiff, I conclude that she has adequately demonstrated a genuine issue of material fact as to the causation element of her hostile work environment claim. "[F]acially sex-neutral incidents" may be considered among the totality of the circumstances for a hostile work environment claim "so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010). Because such an inquiry "often requires an assessment of individuals' motivations and state of mind," "the court should not view the record in piecemeal fashion," and "summary judgment should be used sparingly." *Id.* at 548. The testimony of several employees that the City's supervisors behaved in a verbally abusive, hostile manner toward women and not toward men could allow a reasonable jury to conclude

---

[3] Plaintiff has also submitted other statements regarding defendants' treatment of women that are inadmissible hearsay. *See, e.g.*, Doc. #49-5 at 97 (deposition testimony that "[o]ther female employees have told me that they felt they were being harassed and they were getting written up after they had disagreements with Dorie Price."). Here and elsewhere in this ruling I have considered only evidence that would be admissible at trial. *See, e.g.*, *Doe ex rel. Doe v. Darian Bd. of Educ.*, 110 F. Supp. 3d 386, 395 (D. Conn. 2015) ("[a] party cannot rely on inadmissible hearsay in opposing a motion for summary judgment … absent a showing that admissible evidence will be available at trial.") (internal quotation marks omitted). I have not relied on any statements identified in defendants' motion to strike plaintiff's disputed issue of material fact paragraphs (Doc. #54), with the exception of portions of the Givens deposition, Doc. #49-5 at 55–62, 65–66. Defendants have not included any argument as to why these portions of the deposition are inadmissible. Doc. #54 at 6. Defendants' motion to strike will therefore be denied as moot.

that plaintiff was exposed to the hostile work environment she describes because of her gender. Therefore, I will deny defendants' motion for summary judgment with respect to plaintiff's gender discrimination claims under Title VII and CFEPA.

### Retaliation Against Protected Activity

Counts Two and Four of the complaint further allege that the City retaliated against plaintiff because of her complaints about harassment and discriminatory conduct in violation of Title VII and CFEPA. Under Title VII, an employer may not retaliate or discriminate against an employee because she has opposed any unlawful practice prohibited by Title VII. The usual *McDonnell Douglas* burden-shifting test applies. First, plaintiff must show "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor,* 609 F.3d at 552. If plaintiff establishes "a minimal amount of evidence" to support these elements, then defendants must proffer a legitimate non-retaliatory reason for their adverse employment action, and then plaintiff must carry the ultimate burden to show a genuine fact issue of retaliatory motivation. *Id.* at 552–53. The analysis of a retaliation claim under CFEPA is identical. *Id.* at 556.

Defendants argue that plaintiff's complaint to management about discrimination did not qualify as activity protected by Title VII because she did not make it clear that she was complaining about conduct prohibited by Title VII. Doc. #39 at 92. Informal complaints, including complaints to management, can qualify as protected activity under Title VII. *See, e.g.*, *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). But the complaints must be enough to ensure that the employer "understood, or could reasonably have understood, that the

plaintiff's opposition was directed at conduct prohibited by Title VII." *Kelly v. Howard I. Shapiro & Assoc. Consulting Engineers, P.C.,* 716 F.3d 10, 15 (2d Cir. 2013). In other words, "generalized" complaints are not enough. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (*per curiam*).

Plaintiff's grievance of September 2013 specified that she was complaining about "harassment and discrimination" in her inquiry with the CHRO. Doc. #68 at 12. Such "buzzwords" are indicative of an underlying belief that one's claim has to do with some sort of protected class, such as plaintiff's gender. *See Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 563 (S.D.N.Y. 2013) (noting that an inference of gender discrimination can be made from the use of "key words such as 'discrimination' *or* 'gender.'") (emphasis added). Additionally, plaintiff informed her supervisors in that grievance that she had scheduled a meeting with the CHRO, Connecticut's analogue to the EEOC that is involved with investigating claims of gender discrimination. Doc. #27-5 at 209. And when plaintiff met with the Labor Relations Officer, in describing her complaints about D'Onofrio and Price, she stated that "this has happened to women like me with a similar profile, before I was employed there." Doc. #49-9 at 62.

The combined import of these statements—that she was being discriminated against, that she was pursuing action with the CHRO, and that the actions she was complaining about had "happened to women like me"—are enough that a reasonable jury could conclude that defendants "understood, or could reasonably have understood," that plaintiff's complaints were "directed at conduct prohibited by Title VII." *Kelly*, 716 F.3d at 15.

Plaintiff has also submitted evidence that the action was causally connected to her protected activity. The events precipitating her suspension from work began at the November 15 meeting regarding plaintiff's alleged cursing in front of D'Onofrio on November 9. Plaintiff has

submitted evidence that cursing in her office was rampant, Doc. #27-5 at 177, and a reasonable jury could conclude that the disciplinary action initiated against plaintiff was a pretext motivated by plaintiff's complaint.

The evidence regarding what happened at that meeting—namely, whether plaintiff threatened D'Onofrio physically or whether she merely threatened legal action—is essentially a matter of conflicting testimony. Doc. #49-4 at 101; Doc. #27-4 at 182; Doc. #27-5 at 170–71. Viewed in the light most favorable to the plaintiff, the evidence is that plaintiff merely threatened to try to have D'Onofrio fired, and that D'Onofrio consequently manufactured his story to the police about plaintiff giving him reason to fear physical harm. The proximity in time between D'Onofrio allegedly making up this tale and plaintiff's complaints against him could lead a reasonable jury to conclude that D'Onofrio went to the police because of plaintiff's complaints.[4]

If a jury were to find that the disciplinary hearing in November and subsequent manufacture of the story in which plaintiff threatened physical harm to D'Onofrio were motivated by retaliatory animus, it would also easily be possible to conclude that plaintiff suffered an adverse employment action because of these events. While "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action," *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006), plaintiff's supervisors allegedly manufactured a false police statement, "wouldn't back down" from their insistence that the police should arrest plaintiff, Doc. #49-4 at 116–17, and then used that arrest as an excuse to put plaintiff on administrative leave and investigate her.

---

[4] Because plaintiff's testimony and the testimony of her union representative, Rita Marcus, is sufficient for me to consider this incident in a way favorable to plaintiff, it is unnecessary for me to reach plaintiff's request that I make an adverse inference against defendants for their alleged mishandling of the videotape evidence that may have depicted this incident. *See* Doc. #49 at 37.

The relevant standard is whether defendant's actions would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). A reasonable jury could find that defendant's actions here passed that test. Accordingly, I will therefore deny defendants' motion for summary judgment with respect to plaintiff's retaliation claims under Title VII and CFEPA.

### First Amendment Retaliation

Count Five of the complaint alleges a claim for First Amendment retaliation pursuant to 42 U.S.C. § 1983. In order to prove a claim of retaliation for engaging in constitutionally protected speech, a government employee must show (1) that she has engaged in speech of the type that is subject to protection in the government employment context; (2) that her government employer took adverse action against her; and (3) that there was a causal connection between the protected speech or association and the adverse action. *See Bourne v. City of Middletown*, 2017 WL 1138125, at *4 (D. Conn. 2017) (citing *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)).

In the government employment context, the First Amendment protects speech uttered by an employee in his or her capacity as a citizen regarding a matter of public concern. *See Lane v. Franks,* 134 S.Ct. 2369, 2378 (2014); *Lynch v. Ackley*, 811 F.3d 569, 577-78 (2d Cir. 2016). The Second Circuit has "rejected a categorical approach that places all speech aimed at redressing personal grievances in the employment context beyond the scope of the First Amendment." *Huth v. Haslun*, 598 F.3d 70, 74 (2d Cir. 2010). Instead, the relevant question is whether the employee's speech relates as well to broader issues or is solely about the employee's own grievance. If, however, a public employee's speech is solely about her own personal concerns,

then this does not suffice to justify a claim for First Amendment retaliation. *See id.* at 74-75;
*Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009).

Here, plaintiff's grievances focused on her own dissatisfaction with her employment
context. While plaintiff occasionally invoked examples of other women facing similar
mistreatment, she repeatedly disclaimed an intent to make her case about others, specifically
telling Price "I'm not here to be like a whistle blower. This is about me," and saying "I just
wanted my situation mediated, I wanted it to stop and I wanted to do my job and move on." Doc.
#49-4. at 65. Plaintiff has not pointed to any comments in the record to bolster her First
Amendment claim. Doc. #49 at 65–67. In the face of her disclaimers, and absent evidence to the
contrary, I conclude that defendants' motion for summary judgment should be granted as to
plaintiff's First Amendment retaliation claim.

### *Procedural Due Process*

Count Six of the complaint alleges a claim for a violation of the Due Process Clause
pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants Price, D'Onofrio, and Deida
violated her procedural due process rights by tarnishing her reputation when they reported her to
the police and withheld exculpatory evidence. Doc. #1 at 20.

A plaintiff has a cause of action for loss of a liberty interest in her reputation if she is
deprived of such reputation without due process of law. This type of claim is known as a
"stigma-plus" due process claim. *Monserrate v. New York State Senate*, 599 F.3d 148, 158 (2d
Cir. 2010). To prevail on such a claim, a plaintiff must generally prove that the defendant has
uttered a false statement that is injurious to her reputation ("stigma") and that this false statement
has resulted in some tangible and material burden to plaintiff beyond the stigmatizing statement
itself ("plus"). *See ibid.*

Even if these two elements are met, however, "the availability of adequate process defeats a stigma-plus claim." *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006). That is because, "[l]ike any procedural due process claim, a stigma-plus claim enforces a limited but important right, the right to be heard 'at a meaningful time and in a meaningful manner.'" *Ibid.* (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). In *Segal*, the Second Circuit held that, for an at-will government employee, "the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim." *Id.* at 214.

Plaintiff does not appear to be an at-will employee, but rather one subject to a collective-bargaining agreement. Nonetheless, the process available to her also appears to be correspondingly greater. Plaintiff does not dispute that, had she returned to work, she would have been given the opportunity for all of the procedures afforded by her collective bargaining agreement such as grievances or the ability to contest any disciplinary charges that had been brought against her. Doc. #39 at 116–17; Doc. #49 at 69. Nor does plaintiff provide evidence that these procedures would have been inadequate. Plaintiff merely cites case law stating that procedures afforded under a collective bargaining agreement may not be enough. Doc. #49 at 69.

"[T]he failure of the plaintiff to make use of an adequate post-deprivation remedy such as a grievance hearing . . . will defeat a procedural due process claim on the merits, even if the post-deprivation remedy is no longer available at the time of suit." *Hefferan v. Corda*, 498 Fed. App'x 86, 88 (2d Cir. 2012) (citing *Segal,* 459 F.3d at 218 n.10). The evidence in the record is that plaintiff was provided an opportunity to return to work, and plaintiff does not dispute defendants' assertion that doing so would have afforded her a procedural remedy. Nor does plaintiff adduce evidence that such a remedy would be inadequate. I therefore conclude that

plaintiff has failed to demonstrate a genuine issue of material fact as to her stigma-plus claim, and defendants' motion for summary judgment will be granted on this claim.

### Substantive Due Process

Count Seven of the complaint alleges that defendants violated her due process rights by withholding exculpatory evidence and using the judicial process to retaliate against plaintiff. Doc. #1 at 21. Plaintiff has defended this claim only with a single paragraph that consists entirely of a quotation regarding the standards for substantive due process. But "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality opinion). Claims such as abuse of process "are typically analyzed under the rubric of procedural, not substantive, due process." *Kennedy-Bifulco v. Town of Huntington*, 2010 WL 6052343, at *14 (E.D.N.Y. 2010) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). Substantive due process does not apply simply where government action is merely "incorrect or ill-advised." *Ibid.* (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). Plaintiff has made no procedural due process argument regarding the abuse of process claim in her complaint, and substantive due process protections do not seem to apply. I will therefore grant defendants' motion to dismiss the substantive due process claim.

### Conspiracy

Counts Eight and Nine of the complaint allege a civil rights conspiracy pursuant to 42 U.S.C. § 1985 and also a state law claim for civil conspiracy. These claims are barred by the intra-corporate conspiracy doctrine, under which "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008); *see also Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *Harp v. King*,

266 Conn. 747, 777–86 (2003). All defendants are employees of the City of Bridgeport and were acting within the scope of their employment.

Plaintiff argues that this claim is not barred by the doctrine because an exception exists where the individuals within an alleged conspiracy have "pursu[ed] personal interests wholly separate and apart from the entity." *Tardd v. Brookhaven Nat. Laboratory*, 407 F. Supp. 2d 404, 414 (E.D.N.Y. 2006). Plaintiff cites *Roniger v. McCall*, 72 F. Supp. 2d 433, 438 (S.D.N.Y. 1999), and argues that "[k]eeping one's job and appearing in a favorable light are recognized as personal interests." Doc. #49 at 75. But as *Roniger* notes, "[t]o some degree or another . . . all individuals have a financial stake in the positions they occupy . . . . It is for this reason, perhaps, that courts have at times held that an employee must have been motivated 'solely' by personal bias or exclusively personal interests in order for the personal interest exception to apply." *Roniger*, 72 F. Supp. 2d at 440 (internal citation omitted).

Even when the evidence is regarded in the light most favorable to plaintiff, defendants' actions do not appear to have been motivated by exclusively personal interests. Instead, defendants' actions all occurred within the scope of their employment—plaintiff's complaint is primarily about the means by which defendants disciplined and investigated her in her workplace. A supervisor's duties include enforcing workplace rules and meeting with those accused of violating them; if those meetings result in behavior the supervisor deems threatening, it is also within the bounds of a supervisor's duties to report the employee to outside authorities. Plaintiff has provided no evidence of exclusive and separate personal interests underlying any defendants' actions. Accordingly, in the absence of such evidence, defendants' motion for summary judgment will be granted on the conspiracy claims.

### *Abuse of Process*

Plaintiff next alleges a claim for "abuse of process" against the individual defendants. "An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." *Mozzochi v. Beck*, 204 Conn. 490, 494 (1987). But plaintiff has not adduced evidence about how defendants used any legal process against her, let alone in an improper manner.

Plaintiff has adduced evidence of a false statement to the police but this is not enough to sustain an abuse-of-process claim. While a false statement to the police to encourage prosecution may form the basis for a malicious prosecution action, abuse of process is a tort that lies for actions farther down the procedural road. "The distinction between malicious prosecution or vexatious suit and abuse of process as tort actions is that in the former the wrongful act is the commencement of an action without legal justification, and in the latter it is in the subsequent proceedings, not in the issue of process but in its abuse." *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 360-61 n.16 (2001). The case plaintiff cites for the proposition that "a private person cannot escape liability if he knowingly presents information that is false," involved a malicious prosecution action, not an abuse-of-process action. *See Crocco v. Advance Stores Co.*, 421 F. Supp. 2d 485, 507 (D. Conn. 2006). Accordingly, because plaintiff has not adduced evidence of defendants' improper use of legal process against her, I will grant defendants' motion for summary judgment on plaintiff's abuse-of-process claim.

### *Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress*

Counts Eleven and Twelve of the complaint allege that the individual defendants committed the torts of negligent and intentional infliction of emotional distress. A claim for negligent infliction of emotional distress requires a showing that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress

was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444 (2003). Under Connecticut law, "negligent infliction of emotional distress in the employment context arises only when it is based upon unreasonable conduct of the defendant in the termination process." *Parsons v. United Technologies Corp.,* 243 Conn. 66, 88 (1997). Here, however, plaintiff's claim concerns conduct involving a report to the police that is outside the workplace context.

This Court has allowed claims for negligent infliction of emotional distress to survive when there are false allegations about an employee's performance or lies to customers. *See Grossman v. Computer Curriculum Corp.*, 131 F. Supp. 2d 299, 309 (D. Conn. 2000); *Tomby v. Cmty. Renewal Team, Inc*., 2010 WL 5174404, at *5 (D. Conn. 2010) ("[F]alsely accusing a plaintiff of misconduct or publicizing false reasons for a plaintiff's termination to other employees may be sufficiently unreasonable conduct to support a claim of negligent infliction of emotional distress."). Here, plaintiff has adduced evidence that defendants lied regarding her physically threatening them and posing a danger to her coworkers. A reasonable jury could conclude that a person falsely accused by her coworkers of disorderly conduct sufficient to result in criminal charges could foreseeably suffer severe emotional distress as a result of the accusation, especially when the accusation was made by coworkers who have an alleged history of verbally abusing the target of the false accusation. I will therefore deny defendants' motion for summary judgment on plaintiff's claim for negligent infliction of emotional distress.

As for plaintiff's claim for intentional infliction of emotional distress, she is required to prove four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the

conduct was extreme or outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). A reasonable jury could find plaintiff has demonstrated the first, third, and fourth elements for the reasons discussed above.

In *Crocco v. Advance Stores Co. Inc.*, the plaintiff was an employee who accused her employer of falsely stating to the police that she was a threat. *See* 421 F. Supp. 2d at 492–93. The court held that "reasonable minds could differ on the question of whether . . . knowingly reporting false information to [the police] so as to give the impression that [plaintiff] was stalking or threatening them would constitute extreme and outrageous conduct." *Id.* at 505. Likewise, I conclude that—while reasonable minds could differ—the evidence adduced in this case, in which plaintiff has described a pattern of intense harassment culminating in a false report to the police, is one in which a reasonable jury could conclude that defendants' conduct was extreme or outrageous. Accordingly, I will deny defendants' motion for summary judgment on plaintiff's claim of intentional infliction of emotional distress.

### *Indemnification*

Count Thirteen alleges a claim for indemnification from the City to the individual defendants for any sums for which the individual defendants may become liable to pay. *See* Conn. Gen. Stat. § 7-465. I will grant defendants' motion for summary judgment on indemnification only as to the counts against individual defendants that I have dismissed pursuant to this ruling.

### *Data Disclosure*

Count Fourteen alleges that the City violated provisions of Connecticut's personal data protection laws, Conn. Gen. Stat. § 4-190 *et seq*. Plaintiff appears to be referencing defendants' alleged withholding of videotape footage from the incident of November 15 incident. It is not immediately clear that such footage would qualify for protection as personal data under § 4-190(9). In any event, however, plaintiff has not defended this count in her briefing, and so I conclude that it has been abandoned. *See Kovaco* 834 F.3d at 143 ("a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). Accordingly, I will grant defendants' motion for summary judgment as to Count Fourteen.

## CONCLUSION

Defendants' amended motion for summary judgment (Doc. #39) is GRANTED in part and DENIED in part. The motion is GRANTED as to Counts One through Four (Title VII and CFEPA discrimination and retaliation) insofar as these counts may be based on a claim of discrimination or retaliation on the grounds of sexual orientation. The motion is otherwise DENIED as to Counts One through Four insofar as these counts are based on a claim of discrimination or retaliation based on gender. The motion is GRANTED as to Count Five (First Amendment retaliation), Count Six (procedural due process), Count Seven (substantive due process), Count Eight (civil rights conspiracy), Count Nine (civil conspiracy), and Count Ten (abuse of process). The motion is DENIED as to Count Eleven (negligent infliction of emotional distress) and Count Twelve (intentional infliction of emotional distress). The motion is GRANTED as to Count Thirteen (indemnification) with respect to any other dismissed count and DENIED with respect to any count against an individual defendant that has not been dismissed.

The motion is GRANTED as to Count Fourteen (data disclosure). Defendants' motion to strike plaintiff's improper disputed issues of material fact paragraphs (Doc. #54) is DENIED as moot.

It is so ordered.

Dated at New Haven, Connecticut, this 5th day of September 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge